IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| W.J.C.C., ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil No. 3:25-cv-00153 |
| ) | Judge Stephanie L. Haines |
| DONALD J. TRUMP, *In his official* ) | |
| *capacity as President of the United States*, ) | |
| *et al.*, ) | |
| ) | |
| Respondents. ) | |

**OPINION**

**I.  Introduction**

Petitioner W.J.C.C. ("W.J.C.C."), a Venezuelan man who is currently in immigration custody and represents that he is subject to President Donald J. Trump's ("President Trump") Proclamation invoking "the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" (the "Proclamation"), 90 Fed. Reg. 13034, pursuant to the Alien Enemies Act of 1798, (the "AEA"), 50 U.S.C. § 21, requests that this Court enter a preliminary injunction in this matter. Specifically, W.J.C.C. requests an injunction barring: (1) his removal under the Proclamation and the AEA absent twenty-one (21) days' notice and an opportunity to be heard consistent with this Court's opinion in *A.S.R. v. Trump*, No. 3:25-CV-113, 2025 WL 1378784 (W.D. Pa. May 13, 2025) ("*A.S.R.*"), and (2) his transfer from the Western District of Pennsylvania (the "WDPA") except as pursuant to Title 8 of the United States Code. (ECF No. 22 at 1).

For the following reasons, the Court GRANTS IN PART and DENIES IN PART W.J.C.C.'s Motion for a Preliminary Injunction. (ECF No. 22). Specifically, the Court GRANTS W.J.C.C.'s Motion insofar as the Court orders the Government to comply with the notice

requirements that the Court articulated in *A.S.R.* relative to W.J.C.C. However, the Court DENIES W.J.C.C.'s Motion insofar as he seeks an injunction barring his transfer from the WDPA except as pursuant to Title 8.

## II. Background

This case begins with the AEA, which provides that:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

50 U.S.C. § 21.

On March 14, 2025, President Trump signed his Proclamation invoking the AEA. In relevant part, that Proclamation provides as follows:

> On February 20, 2025, the Secretary of State of the United States designated Tren de Aragua ("TdA") as a Foreign Terrorist Organization ("FTO") pursuant to 8 U.S.C. § 1189. TdA has thousands of members.
>
> TdA is closely aligned with, and has infiltrated, the Maduro regime, including its military and law enforcement apparatus. TdA grew significantly while Tereck El Aissami served as governor of Aragua between 2012 and 2017. In 2017, El Aissami was appointed as vice president of Venezuela. Soon thereafter, the United States Department of the Treasury designated El Aissami as a Specially Designated Narcotics Trafficker under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 et seq. El Aissami is currently a United States fugitive facing charges arising from his violations of United States sanctions triggered by his Department of the Treasury Designation.

> Nicolas Maduro ("Maduro") claims to act as Venezuela's President and asserts control over the security forces and other authorities in Venezuela. He further leads the regime-sponsored enterprise Cartel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to "flood" the United States. In 2020, Maduro and other regime members were charged with narcoterrorism and other crimes in connection with this plot against America.
>
> Over the years, Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA. The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States.
>
> TdA operates in conjunction with Cartel de los Soles … and commits brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking. TdA has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States. Many members of TdA have unlawfully infiltrated the United States and are conducting irregular warfare and undertaking hostile actions against this country.
>
> In December 2024, INTERPOL Washington found that TdA has emerged as a significant threat to the United States as it infiltrates migration flows from Venezuela.

90 Fed. Reg. 13034.

As a result of the foregoing, President Trump found that TdA is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." *Id.* Further, President Trump concluded that TdA is taking such actions "against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." *Id.* As a result, President Trump directed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *Id.*

On May 13, 2025, this Court entered its Opinion in *A.S.R.* 2025 WL 1378784. In that decision, this Court found, after extensive consideration and analysis, that the Proclamation "meets the definition of 'predatory incursion' under the AEA[.]" *Id.* at *18. Further, this Court analyzed the constitutionality of the notice that Respondents wished to provide to individuals they deemed subject to the AEA and the Proclamation. *Id.* at *19–20. Specifically, Respondents intended to provide "individuals designated for removal under the AEA at least 12 hours' notice in order to indicate that they will seek habeas relief. If an individual indicates that he or she intends to file in habeas, then Respondents will give that individual at least another 24 hours to so file." *Id.* at *7. In the event that an individual filed for habeas, Respondents had no "intent to remove that individual pending his or her litigation." *Id.* Deeming that notice constitutionally deficient, this Court held that:

> Respondents must provide to individual detainees who are subject to the AEA and the Proclamation the following notice before removing them pursuant to those provisions of law: (1) twenty-one (21) days' notice and an "opportunity to be heard," (2) notice that clearly articulates the fact that the individual detainee is subject to removal under the Proclamation and the AEA, and (3) notice in English and Spanish, the language of those sought to be expelled, and if needed, Spanish-to-English interpreters shall be provided for any necessary hearings. In the case of A.S.R., if Respondents … designate him as subject to the AEA and the Proclamation, they must provide all of the foregoing notice to his counsel at that time.

*Id.* at *20. Finally, the Court rejected A.S.R.'s additional arguments challenging the legality of the Proclamation. *Id.* at *20–22.

On May 21, 2025, W.J.C.C. filed his Habeas Petition in this matter. (ECF No. 1). In that document, he represented that he is a "Venezuelan man in immigration custody at risk of imminent removal under the [] Proclamation invoking the [AEA]." (*Id.* at 1). On that same day, W.J.C.C. submitted an Emergency Motion for a Temporary Restraining Order, requesting an order barring: "(1) any removal outside the country pursuant to the [AEA], (2) any transfer outside of the

4

[WDPA], and (3) notice to Petitioner and undersigned counsel of any designation of an Alien Enemy under the Proclamation, at least 21 days prior to any removal under the Proclamation." (ECF No. 2 at 1).

On May 22, 2025, this Court entered a Temporary Restraining Order ("T.R.O.") in accordance with W.J.C.C.'s request. (ECF No. 4). This Court separately set a briefing schedule on W.J.C.C.'s Motion and scheduled a hearing on that Motion. (ECF No. 7).

After receiving that briefing and conducting a hearing, this Court entered an Opinion and an Order on June 4, 2025, extending its T.R.O. until June 19, 2025, at 9:32 A.M. (ECF Nos. 20, 21). In its Opinion, this Court: (1) found that W.J.C.C. has standing to challenge his removal under the AEA and the Proclamation; (2) held that it was appropriate to extend the T.R.O. for fourteen (14) days; (3) ruled that it was appropriate to order Respondents to provide W.J.C.C. with the same notice that the Court articulated in *A.S.R.*; (4) ordered Respondents not to remove W.J.C.C. from the WDPA under any provision of law other than the Immigration and Nationality Act (the "INA"); and (5) denied W.J.C.C.'s request for a T.R.O. in all other respects. (*See* ECF No. 20). In its Order, the Court: (1) permitted W.J.C.C. to file a Motion for a Preliminary Injunction and set a briefing schedule in the event that he so filed; (2) scheduled a hearing on W.J.C.C.'s Motion for a Preliminary Injunction in the event that he so filed; (3) directed that the Court's T.R.O. would expire upon the earlier of its resolution of any Motion for a Preliminary Injunction or June 19, 2025, at 9:32 A.M.; (4) permitted W.J.C.C. to file an Amended Petition for a Writ of Habeas Corpus; and (5) ordered that W.J.C.C.'s nominal bond of $1.00 remained appropriate for the entry of the T.R.O. (*See* ECF No. 21).

On June 9, 2025, W.J.C.C. filed his Motion for a Preliminary Injunction. (ECF No. 22). As the Court noted earlier, in that document, he seeks an injunction: (1) requiring Respondents to

5

provide him with the notice that this Court articulated in *A.S.R.* before removing him from this country under the AEA and the Proclamation and (2) barring Respondents from transferring him from the WDPA except as pursuant to Title 8 of the United States Code. (*Id.* at 1). On that same day, W.J.C.C. filed a Brief in Support of his Motion for a Preliminary Injunction. (ECF No. 23). On June 12, 2025, Respondents filed their Brief in Opposition to W.J.C.C.'s Motion. (ECF No. 28). Finally, on June 17, 2025, W.J.C.C. filed his Reply. (ECF No. 34).

Two particular aspects of Respondents Brief in Opposition are especially relevant to the resolution of W.J.C.C.'s Motion for a Preliminary Injunction. First, Respondents argue that W.J.C.C. lacks standing to pursue his claims regarding the AEA and the Proclamation. (ECF No. 28 at 17). Second, Respondents provide this Court with revised notice procedures (the "Revised Notice Procesures") for individuals subject to removal under the AEA and the Proclamation that they contend comply with the law. (*Id.* at 21–29). Those notice procedures are as follows:

> The new notice form tells aliens, in a language they can understand, that they can contest their removal under the AEA by filing a habeas petition in the district where they are detained. The notice form further informs aliens that they may retain counsel, make calls for that purpose, and will be given a list of potential counsel upon request.
>
> Aliens will be given seven days from receipt of that notice to file habeas petitions, during which time the aliens will not be removed under the AEA. Aliens who petition for habeas will not be removed until that petition is resolved.

(*Id.* at 15).

On June 18, 2025, this Court held a hearing on W.J.C.C.'s Motion for a Preliminary Injunction.

Finally, the Court notes that, on June 11, 2025, W.J.C.C. filed an Amended Petition for a Writ of Habeas Corpus. (ECF No. 25). In that document, he reiterates his contention that the notice Respondents intend to provide to detainees subject to the AEA and the Proclamation violates the

Fifth Amendment's Due Process Clause. (*Id.* at 18–19). Further, W.J.C.C. contends that his "continued detention without any evaluation of whether he poses a danger or flight risk violates the Due Process Clause." (*Id.* at 19).

## III.    Discussion

In beginning its discussion of W.J.C.C.'s Motion for a Preliminary Injunction, the Court first incorporates by reference all of its legal conclusions from *A.S.R.* regarding the legality of the Proclamation and its implementation and re-adopts them here in full. Further, having considered Respondents' arguments, the Court reaffirms its earlier conclusion that W.J.C.C. has standing to challenge his removal under the AEA and the Proclamation. *W.J.C.C. v. Trump*, No. 3:25-CV-153, 2025 WL 1572856, at *2–3 (W.D. Pa. June 4, 2025). With those findings in place, the Court is left to consider two primary issues in resolving W.J.C.C.'s Motion for a Preliminary Injunction: (1) whether this Court should permit Respondents to provide individuals subject to the AEA and the Proclamation with the Revised Notice Procedures alone or continue to require Respondents to provide W.J.C.C. with the notice that this Court articulated in *A.S.R.* and (2) whether to bar Respondents from moving W.J.C.C. from the WDPA under the AEA. For the following reasons, the Court *will* continue to require Respondents to comply with the notice it articulated in *A.S.R.* relative to W.J.C.C. and *will not* bar Respondents from moving W.J.C.C. from the WDPA under the AEA.

### A.    The Court Will Continue to Require Respondents to Comply With the Notice That This Court Articulated in *A.S.R.* Relative to W.J.C.C.

Turning first to the issue of notice, the Court begins with what W.J.C.C. must show in order to obtain a preliminary injunction. As the Third Circuit has explained:

> "Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (internal quotation marks omitted). Under the familiar

7

standard of proof, a party "seeking a preliminary injunction must establish that [he] is likely to succeed on the merits, that [he] is likely to suffer irreparable harm in the absence of preliminary injunctive relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Generally, the moving party must establish the first two factors and only if these gateway factors are established does the district court consider the remaining two factors." *Greater Phil. Chamber of Com. v. City of Phil.*, 949 F.3d 116, 133 (3d Cir. 2020) (internal quotation marks omitted). If the gateway factors are met, "[t]he court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* (internal quotation marks omitted).

*SEC v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024) (cleaned up).

In light of this standard, the Court now asks whether W.J.C.C. has shown a likelihood of success on the merits on the issue of notice. For the following reasons, the Court finds that he has.

Three days after this Court issued its decision in *A.S.R.*, the United States Supreme Court issued its ruling in *A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025). Therein, the Supreme Court stressed that it was not "address[ing] the underlying merits of the parties' claims regarding the legality of removals under the AEA." *Id.* at 1368. However, the Supreme Court did offer the following articulation of what process the Fifth Amendment requires in this context:

> "The Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025). "Procedural due process rules are meant to protect" against "the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). We have long held that "no person shall be" removed from the United States "without opportunity, at some time, to be heard." *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903). Due Process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties" and that "afford[s] a reasonable time … to make [an] appearance." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Accordingly, in *J.G.G.*, this Court explained—with all nine Justices agreeing—that "AEA detainees must receive notice … that they are subject to removal under the [AEA] … within a reasonable time and in such a manner as will allow them to actually seek habeas relief" before removal. 145 S. Ct. at 1006. In order to "actually seek habeas relief," a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief.

8

*A.A.R.P.*, 145 S. Ct. at 1367–68. Therefore, after taking stock of certain circumstances relative to removals under the AEA and the Proclamation, the Court held that "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal surely does not pass muster." *Id.* at 1368. (identifying the following circumstances in reaching that conclusion: (1) the nature of the notice that the Government was then providing to AEA detainees, (2) the uncontested assertion that the Government was poised to carry out removals imminently, and (3) the fact that the Government had represented elsewhere that it is unable to provide for the return of an individual deported in error to El Salvador).

At the outset, this Court observes that the foregoing law strongly supports its decision to persist in requiring the notice that it articulated in *A.S.R.*

In opposition to this finding, Respondents stress that the Revised Notice Procedures that they wish to apply afford "far greater process than what the federal immigration laws offer in analogous contexts." (ECF No. 28 at 23). Specifically, Respondents point to the expedited-removal process under "8 U.S.C. § 1225(b)[, which] subjects certain illegal aliens to immediate removal 'without further hearing or review,' 8 U.S.C. § 1225(b)(1)(A)(i), subject to only a limited window to establish a 'credible fear of persecution.'" (*Id.*) (quoting *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020)).

However, for two primary reasons, the Court finds that the expedited-removal process under Section 1225(b) is not an appropriate analog here.

First, the expedited-removal procedures apply to aliens who have "not been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility[,]" among other things. *Thuraissigiam*, 591 U.S. at 109 (internal quotation marks omitted). Conversely, the Proclamation applies to (1) Venezuelan citizens, (2)

9

who are fourteen (14) years of age or older, (3) who are within the United States, (4) who are neither actually naturalized nor lawful permanent residents, and (5) who are members of TdA. *A.S.R.*, 2025 WL 1378784, at *1. The Court's point in noting this distinction is simply to highlight the fact that the expedited-removal procedures and the AEA/the Proclamation clearly apply to different categories of aliens, albeit with the potential for overlap between the two.

Second, and more to the point, under the expedited-removal procedures, an alien subject to removal has a statutory opportunity to indicate an intention to apply for asylum or a fear of persecution. 8 U.S.C. § 1225(b)(1)(A)(i). If an alien so indicates, the alien receives an interview by an asylum officer, and if that officer determines that the alien does not have a credible fear of persecution, that alien may then seek "prompt review by an immigration judge[.]" *Id.* § 1225(b)(1)(A), (B); *see also Thuraissigiam*, 591 U.S. at 109–110. Evidently, in the expedited-removal context, an alien can seek a hearing on certain issues *within the branch of Government by which he is detained*. Conversely, in the context of an individual detained under the AEA and the Proclamation, the Government's proffered notice would apparently only permit a detainee to go to another branch of Government and seek a hearing *from the Judiciary*. In other words, in the expedited-removal context, a detainee's capacity for a hearing is much nearer at hand than it would be in the AEA/Proclamation context. The Court finds that fact highly significant in weighing what the Constitution requires in the context of the AEA and the Proclamation.

The Court offers the following hypothetical to illustrate its point. Assume that detainee John Doe, who is housed in Moshannon Valley Processing Center ("MVPC") in the WDPA receives notice on June 1, 2026, at 12:00 P.M., that he is subject to removal under the AEA and the Proclamation. His only recourse is to file with the Judiciary in habeas. Thus, unlike an individual in expedited-removal proceedings, he apparently may not tell an immigration officer of

10

his intention to apply for asylum or his fear of persecution and thereby obtain a hearing. 8 U.S.C. § 1225(b)(1)(A)(i). Assume that John Doe then begins drafting, through whatever means are available to him, a habeas petition to file in federal court in the WDPA (and/or places a call to his attorney, if he has one). Halfway through drafting his petition (or while waiting for a callback from his attorney, or while still looking for one), on June 4, 2026, at 5:00 P.M., he is placed on a plane, which will arrive in the Northern District of Texas (the "NDTX") at 7:45 P.M. that same evening. He has no opportunity to take his partially drafted petition with him or call his attorney (or find an attorney) before he is transferred. After arriving at Bluebonnet Detention Center ("Bluebonnet") in the NDTX at 11:30 P.M. on June 4, 2026, he takes most of the day on June 5, 2026, to acclimate himself to his surroundings, look for means within the facility to redraft his habeas petition, and places another call to his attorney. By the time he finds means for drafting a petition or hears back from his attorney, it is June 6, 2026, at 12:00 P.M., and he stands to be removed from the country in just two days. Might there not be a significant risk that this individual will not reach the judiciary before his seven days have run their course, meaning that he would be removed without any hearing whatsoever? Might not his movements from one facility to another, his quest to draft a petition, and/or his search for word from an attorney take even longer than the timeframes that the Court has just described?

The Court cannot help but answer those questions in the affirmative. Therefore, having considered the Supreme Court's longstanding holding that "'no person shall be' removed from the United States 'without opportunity, at some time, to be heard[,]'" *A.A.R.P.*, 145 S. Ct. at 1367 (quoting *The Japanese Immigrant Case*, 189 U.S. at 101), and after again weighing the realities of ICE removal proceedings, the risk of errant removals, and the burden upon the Government, *A.S.R.*, 2025 WL 1378784, at *20, the Court reaffirms its finding that the Due Process Clause

mandates the notice requirements that this Court articulated in *A.S.R.*, regardless of the contours of the distinguishable expedited-removal proceedings.

Accordingly, the Court finds that W.J.C.C. has shown a likelihood of success on the merits insofar as he seeks the following notice before his removal from this country under the AEA and the Proclamation: (1) twenty-one (21) days' notice and an "opportunity to be heard," (2) notice that clearly articulates the fact that he is subject to removal under the Proclamation and the AEA, (3) notice in English and Spanish, the language of the one sought to be expelled, and if needed, Spanish-to-English interpreters shall be provided for any necessary hearings, and (4) notice of all of the foregoing to his counsel.

Turning to irreparable harm, the Supreme Court has explained that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") allows for continued "prosecution of a petition after removal[.]" *Nken v. Holder*, 556 U.S. 418, 435 (2009). Accordingly, the "burden of removal alone cannot constitute the requisite irreparable injury" in that context because "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Id.* Conversely, in the context of the AEA, the law is far from settled, and as the United States District Court for the Southern District of New York recently noted, current events make it unclear whether individuals who are removed from the country but are not actually subject to removal (that is, individuals who are removed in error) will be able to return. *G.F.F. v. Trump*, No. 25-CV-2886, 2025 WL 1301052, at *10 (S.D.N.Y. May 6, 2025); *see also A.A.R.P.*, 145 S. Ct. at 1368 (noting that the "Government has represented elsewhere that it is unable to provide for the return of an individual deported in error to a prison in El Salvador").

Further, Respondents have apparently still declined to enter into a binding Stipulation with W.J.C.C. providing that they will afford him the notice that this Court articulated in *A.S.R.* in the absence of an Order from this Court in this case. And the fact that Respondents now seek to remove individuals under the AEA and the Proclamation on seven days' notice confirms the necessity of this Court's action in this context.

Therefore, for all of the foregoing reasons, W.J.C.C. has shown that, in the absence of a Preliminary Injunction from this Court, he faces a significant risk of removal to another country under the AEA and the Proclamation without sufficient notice and an opportunity to be heard before such removal, and without the possibility of return to this country in the event such removal is eventually found to be unlawful. Therefore, the Court finds that W.J.C.C. has shown a significant likelihood of irreparable harm sufficient to warrant a Preliminary Injunction.

Finally, with respect to the balance of the equities and the public interest, because W.J.C.C. is currently detained, he is not posing a risk to public safety at this time. *G.F.F.*, 2025 WL 1301052, at *11. And if this Court does not grant W.J.C.C. injunctive relief, there is a significant risk that he would be deprived of the rights due him under Supreme Court precedent. *Id.* Therefore, the Court finds that the two remaining factors support the grant of a T.R.O. on the issue of notice in this case. *Id.*[1]

Accordingly, this Court grants W.J.C.C.'s Motion for a Preliminary Injunction insofar as he seeks an order requiring Respondents to provide him with the same notice that the Court articulated in *A.S.R.*[2]

---

[1] The Court's Order does not operate as against President Trump. (ECF No. 1 at 5).

[2] The Court finds that the nominal bond of $1.00 that it has previously required W.J.C.C. to post in this matter (ECF No. 4 at 1) remains appropriate under all relevant legal principles. *A.S.R.*, 2025 WL 1378784, at *23.

13

**B.  The Court Will Not Bar Respondents from Moving W.J.C.C. Out of the WDPA Under the AEA**

With respect to the issue of whether this Court should (or may) enjoin Respondents from moving W.J.C.C. out of the WDPA under the AEA, Respondents contend that there is "no firm legal basis to bar Respondents from [taking such action.]" (ECF No. 28 at 29). For his part, W.J.C.C. points to the All Writs Act, which he asserts provides this Court the legal authority to bar Respondents from moving him out of the WDPA under the AEA. (ECF No. 34 at 3–4).

The All Writs Act provides that "'[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'" *Grider v. Keystone Health Cent., Inc.*, 500 F.3d 322, 328 (3d Cir. 2007) (quoting 28 U.S.C. § 1651(a)). "The All Writs Act confers on courts 'extraordinary powers' that are '*firmly circumscribed.*'" *Id.* (emphasis added) (internal quotation marks and citation omitted) (noting that the All Writs Act has typically "been used by federal courts to enjoin action by state courts that threatens the federal court's jurisdiction"). Further, although the Supreme Court has used the All Writs Act to enjoin *removal from the country* under the AEA and the Proclamation, it has not used that Act to enjoin *movement to another judicial district* under those provisions of law. *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025); *A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025).

In light of the foregoing, it is not clear to this Court whether it may enjoin Respondents from moving W.J.C.C. to a different judicial district under the AEA at this stage in this case. However, the Court need not linger long on this issue because W.J.C.C. has failed to show a risk of irreparable harm in the absence of an injunction on this issue.

Indeed, the Court is entering a preliminary injunction today that will require Respondents to provide W.J.C.C. and his counsel significant notice in the event that they designate him for

14

removal under the AEA and the Proclamation. Part of the Court's intention in requiring that notice is to ensure that, if Respondents so designate W.J.C.C., he may contact his attorney and submit an appropriate filing in Court. Despite Respondents' protestations to the contrary, (*see* ECF No. 34 at 4–5), the Court cannot find that W.J.C.C.'s transfer to another district would frustrate that purpose in light of the twenty-one (21) day notice that the Court is requiring. Therefore, setting aside all other issues, the Court finds that W.J.C.C. has failed to show a risk of irreparable harm in the absence of an injunction barring his removal from the WDPA under the AEA.

As an additional matter, in weighing the remaining preliminary injunction considerations, the Court has concerns about limiting Respondents' ability to move W.J.C.C. to a different facility in the future should its weighty interests in the safety of detainees and the orderly operation of detention facilities require such transfer.

Accordingly, for all of the foregoing reasons, the Court denies W.J.C.C.'s request for a Preliminary Injunction on this ground.[3]

## IV. Conclusion

For all of the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART W.J.C.C.'s Motion for a Preliminary Injunction at ECF No. 22.

An appropriate Order follows.

DATED: June 18, 2025

_____
STEPHANIE L. HAINES
U.S. DISTRICT COURT JUDGE

---

[3] As the Court noted earlier, W.J.C.C. has filed an Amended Petition for a Writ of Habeas Corpus challenging his continued detention without an appropriate bond hearing. *See supra* Section II. The Court will enter a separate order referring this case to a magistrate judge for consideration of that issue in the first instance.